UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TAPANGA HARDEMAN, *et al.*,<br>　　　Plaintiffs<br><br>　　v.<br><br>COUNTY OF LAKE, *et al.*,<br>　　　Defendants | No. 17 CV 8729<br><br>Judge Jeremy C. Daniel |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Tapanga Hardeman, Daniel Williams, Lewis Myles, Quenta Lamar Washington, and Lavonte Murel, on behalf of themselves and two certified classes, filed this action against the County of Lake, the Office of the Lake County Sheriff, Sheriff Mark Curran, Chief David Wathen, and John Doe Officers and Supervisors, alleging violations of the Civil Rights Act of 1871, 42 U.S.C. § 1983. (R. 40, Ex. C, at 25–35 ("FAC.").)[1] The plaintiffs allege that the defendants violated their Fourteenth Amendment rights as pretrial detainees and Eighth Amendment rights as postconviction inmates during a three-day water shutoff at the Lake County Adult Correctional Facility (hereinafter, "Lake County Jail" or "Jail"). The defendants move for summary judgment on the plaintiffs' claims. (R. 130.) For the reasons below, the motion is granted in part and denied in part.

---

[1] For CM/ECF filings, the Court cites to the page number(s) set forth in the document's CM/ECF header unless citing to a particular paragraph or other page designation is more appropriate.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions,[2] the materials cited therein, and other aspects of the record in this case. All facts are genuinely undisputed unless otherwise noted.

This action arises from the class members' detention at the Lake County Jail from November 8 to 10, 2017. (*See, generally,* FAC.) The Lake County Jail is a six-story facility located in Waukegan, Illinois. (Def.'s SOF ¶ 1.) Most of the detainees[3] at the Jail reside in housing units, or "pods," located on floors three through six. (Def.'s SOF ¶ 2; R. 136, Ex. 2 ("Uchiek Aff.") ¶¶ 7, 9.) A pod consists of two levels with an open area in the middle called a "dayroom," which is surrounded by banks of cells. (Def.'s SOF ¶ 3; Uchiek Aff. ¶ 10.)

As a multistory building, the Lake County Jail relies on "booster pumps"—*i.e.*, a system of pumps and a computerized control box mounted to a metal skid—to supply water to each floor of the Jail. (Def.'s SOF ¶ 16; R. 136, Ex. 1 ("Varco Aff.") ¶¶ 10–11.) The booster pumps increase the water pressure coming from the City of Waukegan's water mains so that each floor of the Jail receives sufficient water supply. (Def.'s SOF ¶ 16; Varco Aff. ¶ 10.) The booster pumps operate twenty-four hours a day, seven days a week to supply water to the Jail. (Varco Aff. ¶ 10.) In addition to the booster pumps, the Lake County Jail operates an HVAC system.

---

[2] *See* Defendants' Statement of Material Facts, (R. 131) ("Def.'s SOF"); Plaintiff's Response to Defendants' Statement of Material Facts, (R. 133) ("Pl.'s Resp. to Def.'s SOF"); Plaintiffs' Statement of Additional Material Facts, (R. 135) ("Pl.'s SOAF"); Defendants' Response to Plaintiffs' Statement of Additional Facts, (R. 138) ("Def.'s Resp. to Pl.'s SOAF".)

[3] The Court uses the term "detainees" to refer collectively to pretrial detainees and postconviction inmates housed at the Lake County Jail.

2

(Def.'s SOF ¶ 20; Varco Aff. ¶ 31.) The HVAC system is designed to exchange and circulate fresh air to ensure that the right oxygen levels are replenished in the Jail. (Def.'s SOF ¶ 20; Pl.'s SOAF ¶ 18; R. 136, Ex. 3 ("Varco Dep.") at 59:07–10.) It is not designed to address odors in the building. (Varco Dep. at 59:06–07; 59:11–14.)

In 2017, in conjunction with other construction projects occurring near the Jail, the County's Facilities Department planned to replace the Jail's booster pump system which, at this point, was over thirty-years old. (Pl.'s Response to Def.'s SOF ¶ 17; Def.'s SOF ¶ 18.) The project entailed installation of three new pumps and their related computerized controller, as well as a bypass pipe that would enable water to bypass the booster pumps if maintenance or other work on the pumps was required in the future. (Def.'s SOF ¶¶ 18–19.) Because water enters the Jail at one location, the pump replacement required that the water be shutoff to the entire Jail for the duration of the project. (Def.'s SOF ¶ 23.)

The defendants initially planned for the pump replacement to take place over a two-day timeframe, but the project timeline was extended to span three days. (Def.'s SOF ¶¶ 23–24; Uchiek Aff. ¶ 33.). On day one, the water would be shutoff and the existing booster pumps demolished. (Def.'s SOF ¶¶ 24, 37.) On day two, the new booster pumps and the bypass pipe would be installed. (Def.'s SOF ¶ 24.) On day three, the new booster pumps would be commissioned, and water would be restored throughout the building. (Def.'s SOF ¶ 24.)

The defendants also planned for the following measures to be imposed at the Jail during the water shutoff:

3

- **Toilets and Flushing:** A fifty-five-gallon trash barrel and a two-gallon pail were to be supplied to each pod. (Def.'s SOF ¶ 27.) The trash barrels were to be filled with water supplied from the Community Based Correctional Center, a building that was connected to the Jail and was not affected by the water shutoff. (Def.'s SOF ¶ 29.) The detainees were to fill the pails with water from the fifty-five-gallon trash barrels and then, in turn, pour the water from the pails into the Jail's toilet bowls to flush the contents. (Def.'s SOF ¶ 27.)

- **Hydration:** The defendants ordered 7,980 bottles of 16.9-ounces (500 milliliters) of water, plus an additional 600 bottles the day before the shutoff, to be supplied to detainees, Jail staff, and Sheriff's Office personnel for drinking purposes. (Def.'s SOF ¶ 35; Uchiek Aff. ¶ 33; R. 136, Ex. 6 ("Wright Aff.") ¶¶ 15–18.) The defendants were to provide two bottles of water per shift[4] to each detainee. (Def.'s SOF ¶ 39.)

These measures were based on those implemented during past water shutoffs at the Jail; though none of the prior shutoffs had lasted longer than a day. (Pl.'s Response to Def.'s SOF ¶ 26; Varco Aff. ¶ 22; Varco Dep. 32:09–24; 68:05–17; R. 136, Ex. 14 ("Borawski Dep.") at 31:02–33:03; 71:22–73:04.)

In the early morning of November 8, 2017, the Jail's water supply was shut off as planned. (Def.'s SOF ¶ 37.) Water was not restored to the Jail until the evening of November 10, 2017. (Def.'s SOF ¶¶ 37, 62.) The parties dispute the conditions in the pods during the water shutoff. While the defendants contend the environmental conditions within the pods remained "unremarkable," (Def.'s SOF ¶ 61), the plaintiffs contend that the temporary measures outlined above were wholly insufficient to mitigate the absence of running water. (Pl.'s Response to Def.'s SOF ¶ 25.)

For example, despite the provision of the fifty-five-gallon barrels and two-gallon buckets, class members testified that the toilets did not flush properly or

---

[4] There are three working shifts at the Jail: the first from 7:00 a.m.–2:45 p.m.; the second from 2:45 p.m.–11:00 p.m.; and the third from 11:00 p.m.–7:00 a.m. (Def.'s SOF ¶ 6.)

4

completely, and that there was no ability to flush during the nightly lockdowns because detainees were not permitted to leave their cells to fill the buckets. (Pl.'s Response to Def.'s SOF ¶ 48; Pl.'s SOAF ¶ 13; R. 136, Ex. 18 ("Murel Dep.") at 28:11–29:17; R. 136, Ex. 19 ("Hardeman Dep.") at 35:15–36:23.) The class members described clogged toilets and sinks, "piling up" urine and feces, foul-smelling odors, and the splashing of waste materials onto their hands and the floors when they filled up buckets. (Pl.'s SOAF ¶ 14; R. 136, Ex. 17 ("eLogger") at 117); Hardeman Dep. at 35:04–08; R. 136, Ex. 20 ("Bratcher Dep.") at 28:11–29:03, 31:18–32:19.)

Certain class members also testified that they were deprived of sufficient water for hygiene purposes. For instance, while class members were allowed to exercise during the water shutoff, they did not have the ability to shower. (Def.'s Response to Pl.'s SOAF ¶ 4.) Some class members reported not being able to clean themselves sufficiently, or at all, likening having to use the communal 55-gallon barrels for a sponge bath to "taking a bird bath in the garbage can." (Pl.'s SOAF ¶ 22; Bratcher Dep. at 34:07–22; *see also* Pl.'s SOAF ¶ 14; eLogger at 117.) At least one of the defendants' employees reported that they would not have been surprised if class members resorted to using the bottled water that was intended for drinking for personal hygiene purposes during the shutoff. (Def.'s Response to Pl.'s SOAF ¶ 10.)

Class members raised similar concerns regarding sufficient water for hydration. One class member testified that he did not receive any water bottles for drinking on the first day of the water shutoff despite officers having them. (Pl.'s SOAF ¶ 21; Bratcher Dep. at 29:04–16.) Throughout the course of the water shutoff,

5

there were reports of the water bottle supply running low in certain pods. (Pl.'s SOAF ¶¶ 15–16; eLogger at 91, 150, 164.) And though some pods received "Igloo" water jugs during the shutoff, not all class members were provided with this additional water supply. (Pl.'s Response to Def.'s SOF ¶ 42; Def.'s Response to Pl.'s SOAF ¶ 24.)

The parties further dispute whether regular "pod cleanup" occurred during the shutoff, and at least one class member reported observing flies or gnats in his cell. (Def.'s Response to Pl.'s SOAF ¶ 1; Pl.'s SOAF ¶ 26; R. 136, Ex. 16 ("Easley Dep.") at 24:11–13.) The Jail's eLogger notes during the shutoff reflect that "water issue[s]" were not considered grievable issues, and some class members reported that they were threatened with lockdown if they made complaints related to the water shutoff. (Pl.'s SOAF ¶ 25; Easley Dep. at 23:05–09; R. 136, Ex. 17 ("Graham Dep.") at 76:21–77:19; eLogger at 26.)

On December 4, 2017, less than one month after the shutoff, Hardeman filed a class action complaint on behalf of herself and the putative class, alleging that the defendants violated her and other detainees' Eighth and Fourteenth Amendment rights by depriving them of adequate amounts of water during the booster pump replacement. (R. 1.) The Court denied the defendants' motion to dismiss, including on grounds of qualified immunity, (R. 18), which the Seventh Circuit affirmed on interlocutory appeal in *Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019). Thereafter, the Court certified two subclasses of plaintiffs: (A) all persons present in the Lake County Jail between November 8, 2017, and November 10, 2017, being held as pre-trial detainees; and (B) all persons present in the Lake County Jail between

November 8, 2017, and November 10, 2017, as postconviction inmates. (R. 56.) The defendants now move for summary judgment on the plaintiffs' Fourteenth and Eighth Amendment claims. (R. 130.)

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The burden is on the moving party to show that there is no genuine dispute about any material fact. *See Celotex Corp.*, 477 U.S. at 323. To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *Anderson*, 477 U.S. at 256.

For purposes of summary judgment, the Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter; rather, it determines only whether a genuine issue of triable fact exists. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in

favor of the non-movant. *Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## ANALYSIS

### I. CONDITIONS OF CONFINEMENT

"'[T]he Constitution does not mandate comfortable prisons,' but it does mandate humane ones." *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). The Eighth Amendment's prohibition of cruel and unusual punishment "imposes duties on prison officials to 'provide humane conditions of confinement' and 'ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The same principles apply to pre-trial detainees. *Hardeman*, 933 F.3d at 821–22. Because pre-trial detention is not punitive, however, conditions-of-confinement claims brought by pre-trial detainees arise under the Fourteenth Amendment's Due Process Clause; not the Eighth Amendment. *Id.*

The standards governing conditions-of-confinement claims differ depending on whether they are brought under the Fourteenth or Eighth Amendment. *See Kemp v. Fulton Cnty.*, 27 F.4th 491, 495 (7th Cir. 2022). While Fourteenth Amendment conditions-of-confinement claims contain only an objective component, *id.* (citing *Hardeman*, 933 F.3d at 823), Eighth Amendment claims contain an additional "subjective" element, requiring proof of deliberate indifference. *Id.* (explaining the different standards stem from the fact that "pretrial detainees are entitled to the presumption of innocence, and so the Constitution protects them from any *punishment* for the acts that led to their detention") (emphasis in original).

8

The class members ground their constitutional claims on two conditions that they allege to have been subjected to during the three-day water shutoff at the Jail: (1) the denial of the minimal amount of water necessary for essential life activities during the three-day water shutoff; and (2) the deprivation of basic sanitary measures to prevent the buildup of feces. (R. 134 at 6–7.) The defendants argue that the class members cannot satisfy the objective prong of their conditions-of-confinement claims and, thus, neither their Fourteenth nor Eighth Amendment claims survive summary judgment. (R. 130 at 13.) The Court begins with the Fourteenth Amendment analysis because, if the class members cannot survive summary judgment under the objective unreasonableness standard, their claims would necessarily fail under the Eighth Amendment's more rigorous deliberate indifference standard. *See Farmer*, 511 U.S. at 834; *Williams v. Shah*, 927 F.3d 476, 480 (7th Cir. 2019).

### A. Fourteenth Amendment – Objective Unreasonableness

The objective unreasonableness standard governing Fourteenth Amendment conditions-of-confinement claims comes from the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *See Hardeman*, 933 F.3d at 823. Under *Kingsley*, to survive summary judgment, the plaintiffs must provide evidence from which a reasonable factfinder could conclude that: (1) the conditions in question were objectively serious; (2) the defendants acted purposefully, knowingly, or recklessly with respect to the consequences of their actions; and (3) the defendants' actions were objectively unreasonable—"that is, 'not rationally related to a legitimate

9

governmental objective or . . . excessive in relation to that purpose.'" *Id.* at 827 (Sykes, J., concurring) (quoting *Kingsley*, 576 U.S. at 398).

The defendants first contend that the conditions at the Jail during the water shutoff were not objectively serious enough to constitute a constitutional deprivation. (R. 130 at 8–13.) To be objectively serious, the conditions of confinement must result in the denial of "'the minimal civilized measures of life's necessities.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes*, 452 U.S. at 347). In making this determination, the Court looks to the totality of the circumstances, including the "duration and severity" of the plaintiffs' exposure to the alleged unconstitutional conditions. *Hardeman*, 933 F.3d at 824. Even when conditions are not individually serious enough to work a constitutional violation, they may, in combination, violate the Constitution when they have "'a mutually enforcing effect that produces the deprivation of a single, identifiable human need.'" *Budd v. Motley*, 711 F.3d 840, 842–43 (7th Cir. 2013) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

The necessities on which the class members premise their Fourteenth Amendment claims—hydration, hygiene, and sanitation—are well-established. As the Seventh Circuit has explained, life necessities include, "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities[;]" sufficient "water for drinking and sanitation," and "the right to live in an environment free of accumulated human waste." *Hardeman*, 933 F.3d at 820–21, 823; *see also Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). Reading the record in the light most favorable to the class members, the Court finds that there is sufficient evidence from

10

which a reasonable jury could conclude that these necessities were not met for the duration of the water shutoff.

It is undisputed (and obviously so) that the detainees had no access to running water to shower, drink, brush their teeth, wash themselves, flush the toilet, or clean their living spaces for multiple days. Instead, the detainees were limited to a rationed-number of 16.9-ounce water bottles and a fifty-five-gallon barrel of water from which they were expected to bathe, clean their cells, and flush their toilets (but only when feces were present). (*See, e.g.,* eLogger at 22 ("Inmates were told water will be provided for flushing after they go #2, NOT every time they pee and not to fill toilet with toilet paper.").) Whether the water in these fifty-five-gallon barrels was suitable for bathing or cleaning is disputed, (Bratcher Dep. at 31:18–32:19), as is whether the detainees would have had to use the bottled water for hygienic purposes rather than for drinking. (R. 136, Ex. 13 ("Bounds Dep.") at 54:21–55:03.) And as for flushing, there are eLogger notes that corroborate the class members' testimony that the flushing mechanism did not work as planned. (*See* eLogger at 17, 40, 47, 58, 63, 74, 78, 82, 84.)

Further, there is class member-testimony regarding foul-smelling odors arising from the waste-filled toilets, as well as video evidence purporting to show the effect that some sort of odor had on the defendants' employees. (*See, e.g.,* R. 136, Ex. 23, Video A #155624.) Indeed, it is disputed whether the Jail's HVAC system operated normally during the water shutoff and circulated fresh air. (*See* Varco Dep. at 109:20–110:06.) The odors combined with the lack of sufficient drinking water may have

11

caused some detainees to suffer headaches and dehydration, and exacerbated their asthma. (Hardeman Dep. at 46:01–24; Bratcher Dep. at 25:08–26:08.) Moreover, detainees were prohibited from filing any complaints about the lack of running water as the issue was deemed non-grievable, (*see* eLogger at 22, 26), and those that did complain were met with lockdown or threats thereof. (*See, e.g.,* eLogger at 22 ("Inmate awarded 23 hours for arguing with the officer about the water being shut off in the facility, after being told multiple times that it was not a grievable offense.").)

"[T]o avoid summary judgment there must be evidence sufficient to permit a reasonable fact-finder to conclude that [the class members were] deprived of sufficient water to stay hydrated or subjected to unhygienic conditions." *See, e.g., Caldwell v. Woock*, No. 18 C 1074-WMC, 2023 WL 3582349, at *4 (W.D. Wis. May 22, 2023). The Court finds that standard has been met here, as the evidence is sufficient to create a triable fact issue on the severity of the conditions that the class members were subject to during the duration of the water shutoff.

Next, the defendants contend that the class members' claims are not actionable as constitutional violations because the defendants' actions evince, at most, negligence. (R. 130 at 13.) For liability to attach under the Fourteenth Amendment, "a detainee must 'prove more than negligence but less than subjective intent— something akin to reckless disregard.'" *Miranda v. Cnty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018) (quoting *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)). Thus, to prevail on their claims, the class members must prove that the

12

defendants "acted purposefully, knowingly, or [ ] recklessly" when they considered the consequences of shutting off all running water at the Jail for three days. *Id.*

Here, too, there is sufficient evidence in the record from which a reasonable jury could find that the defendants' conduct was more than merely negligent. Specifically, the record shows that the water shutoff was originally planned for a two-day period, not three. (Uchiek ¶ 33.) Further, the mitigation measures that were imposed, *i.e.*, the flushing mechanism and the provision of water bottles, were adopted from previous water shutoffs at the Jail that lasted less than a day. (*See* Varco Dep. at 32:30–33:03; 68:05–17; *see also* Borawski Dep. at 32:04–08 (testifying that past water shutoffs in the Jail typically occurred within a twelve- or twenty-four-hour period).) A reasonable jury could conclude that the defendants deliberately ignored the consequences of implementing these temporary measures for a period of time lasting much longer than the usual twelve- or twenty-four-hour shutoff.

Further, the class members' expert, James Sheehy, a licensed operating stationary engineer, opined that alternative methods could have been used to replace the booster pumps that would have required the water to be shutoff at the Jail for a maximum of eight to twelve hours.[5] (R. 136, Ex. 31 ("Sheehy Report") at 4.) This, too,

---

[5] The defendants argue that the Court cannot consider Sheehy's opinion because it is speculative, lacking in foundation and depth. (R. 137 at 7.) But Sheehy's report indicates that his opinions are based, in part, on his experience working as a licensed stationary engineer since 1985, during which time he has worked with pumps, boilers, and other stationary engineering equipment for various commercial, industrial, institutional, and medical buildings. (Sheehy Report at 1–2.) Federal Rule of Evidence 702, which governs expert opinions, "specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000). The defendants' contentions that Sheehy is not a professional engineer, that he has never worked in or been to Lake County Jail, and that he did not review all the evidence in forming his

raises a triable fact issue as to whether the defendants recklessly disregarded the consequences of shutting off running water to 600 detainees for a multi-day period.

Finally, the defendants contend that the class members' claims must fail because the conditions complained of were reasonably related to a legitimate governmental purpose—that being replacement of the booster pumps. (R. 130 at 8–9.) But regardless of the legitimacy of the defendants' objective, conditions of confinement will be found to have "crossed outside of constitutional bounds" if they were "objectively unreasonable" or "excessive in relation to" that purpose. *Hardeman*, 933 F.3d at 824; *see also Kingsley*, 576 U.S. at 398. There is sufficient evidence in the record to create a genuine fact issue as to whether the measures that the defendants employed during the booster pump replacement were objectively unreasonable given that the plan called for 600 detainees to go without running water for a period of three days. Accordingly, the defendants are not entitled to summary judgment on the class members' Fourteenth Amendment claims.

### B. Eighth Amendment – Deliberate Indifference

Next, the defendants argue that they are entitled to summary judgment on the class members' Eighth Amendment conditions-of-confinement claims. As mentioned above, conditions claims brought under the Eighth Amendment include both an objective and subjective component. The objective component tracks the Fourteenth

---

opinions speak to weight and credibility, matters that fall within the province of a jury. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert is credible or whether his . . . theories are correct . . . is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based.").

Amendment inquiry—"[a] prisoner challenging conditions of confinement must first show that the conditions were sufficiently serious as an objective matter meaning that they den[ied] the inmate the minimal civilized measures of life's necessities, creating an excessive risk to the inmate's health and safety." *Thomas*, 2 F.4th at 719 (internal quotation marks and citations omitted) (alterations in original). For the subjective component, "the inmate must prove that prison officials acted with deliberate indifference[,]" meaning "that they knew of and disregarded this excessive risk of harm to the inmate." *Id.* (citations omitted). Thus, to prove a violation of the Eighth Amendment, the class members must produce evidence that the defendants "were subjectively aware of [the inhumane] conditions and refused to take steps to correct them." *Id.* at 720.

The defendants contend that the class members' claims fail on the subjective prong because the evidence shows that the defendants did not deliberately ignore any issues that arose during the water shutoff. (R. 130 at 13.) The class members do not explicitly respond to the defendants' Eighth Amendment contentions; though they do argue that the defendants "carried out their plan for the shutoff knowing that their efforts to 'mitigate' its impact would not be sufficient, and continued to do so while the conditions of Class Members' confinement grew more objectively unreasonable each day." (R. 134 at 10.)

Viewing the record in the light most favorable to the class members, the Court finds that there is evidence in the record from which a reasonable jury could agree with the class members' position. Specifically, there is evidence in the record showing

15

that issues arose with the flushing mechanism early on in the shutoff and that the detainees were not receiving water bottles as planned. (Bratcher Dep. at 29:04–16; Easley Dep. at 13:21–16:09; eLogger at 17, 40, 47, 58, 63, 74, 78, 82, 84.) Other than supplying some pods with Igloo water jugs, the defendants persisted with the flushing mechanism and limited water bottle supply throughout the duration of the water shutoff. "Knowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference." *Gray,* 826 F.3d at 1009. On this record, the Court finds that there is sufficient evidence for the class members to withstand summary judgment on their Eighth Amendment claims.

## II. *MONELL* LIABILITY

Finally, the defendants argue that even if the challenged conduct is unconstitutional, they are still entitled to summary judgment because the class members have not presented evidence that their injuries were the result of an existing policy, custom, or practice, as opposed to an isolated incident. (R. 130 at 5–6, 13.)

Under *Monell v. Department of Social Services*, local government entities— here, the County of Lake and the Office of the Lake County Sheriff—are liable for constitutional torts arising from their policies or customs. 436 U.S. 658, 694 (1978). For *Monell* liability to attach, a plaintiff must trace the deprivation of a federal right to some municipal action. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022). This may take the form of (1) an express policy, (2) a widespread practice or custom, or (3) action by one with final policymaking authority. *Id.* As the Seventh

16

Circuit "put the point in one case, '[a] person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government . . .'" *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 379 (7th Cir. 2017) (quoting *Vodak v. City of Chi.*, 639 F.3d 738, 747 (7th Cir. 2011)).

Here, the class members seek to impose liability on the Sheriff and the County for creating the conditions at the Jail vis-à-vis the water shutoff and allowing them to persist. There is evidence in the record showing that the Sheriff and the County planned for the water shutoff, incorporating certain measures that they had followed in the past, and that they were acting pursuant to this plan when the challenged conditions arose. The class members thus have provided evidence "trac[ing] the deprivation of a federal right to some municipal action," as is required for *Monell* liability to attach. *Stockton*, 44 F.4th at 617.

In addition to the Sheriff and the County, the class members seek to impose liability on Sheriff Mark Curran and Chief David Wathen. The class members do not present any evidence of these individuals' personal involvement in the constitutional deprivations; thus there is no basis to impose liability on them in their personal capacities. *See Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under [42 U.S.C. § 1983] requires personal involvement in the alleged constitutional deprivation."). Sheriff Curran and Chief Wathen are therefore entitled to summary judgment on any claims brought against them in their personal capacities. Further, because a suit against a government office and the officeholder

17

are identical, any suit against Sheriff Curran and Chief Wathen in their official capacities is redundant of a suit against the Office of the Lake County Sheriff. *See Budd*, 711 F.3d at 843–44. Accordingly, Sheriff Curran and Chief Wathen are dismissed as defendants in their official capacities.

## CONCLUSION

The defendants' motion for summary judgment [130] is granted in part and denied in part. The motion is granted as to any Fourteenth and Eighth Amendment claims brought against Sheriff Mark Curran and Chief David Wathen in their personal capacities. Further, because official capacity claims against these named defendants would be redundant of the claims against the Office of the Lake County Sheriff, Sheriff Mark Curran and Chief David Wathen are dismissed as defendants in their official capacities. The motion for summary judgment is denied as to all other claims. On or before May 13, 2024, the parties shall confer and submit a status report that includes the anticipated length of trial and whether the parties are available for a trial that starts on June 24, 2024, July 22, 2024, November 4, 2024, or November 18, 2024.

Date: May 6, 2024

JEREMY C. DANIEL
United States District Judge